RICHTER CONCRETE CORPORATION,
the Collinwood Shale Brick and Supply
Company, Plaintiff-Appellant,

v.

HILLTOP CONCRETE CORPORATION,
et al., Defendants-Appellees.

No. 81–3266.

United States Court of Appeals,
Sixth Circuit.

Argued July 30, 1982.

Decided Oct. 27, 1982.

Gene I. Mesh, Cincinnati, Ohio, for plaintiff-appellant.

Jacob K. Stein, Gerald Simmons, Murray S. Monroe, Thomas C. Hill, Taft, Stettinius & Hollister, Cincinnati, Ohio, for defendants-appellees.

Before EDWARDS, Chief Judge, and ENGEL and CONTIE, Circuit Judges.

CONTIE, Circuit Judge.

This appeal involves a private anti-trust action brought by the Richter Concrete Company against Hilltop Basic Resources, Inc. and Marquette Cement Company. During 1972–74, the relevant time period for this action, Richter and Hilltop were producers of ready-mix concrete in the Cincinnati area while Marquette supplied cement in that same area.

In its complaint, Richter alleged that: (1) Hilltop violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by attempting to monopolize the ready-mix concrete market in the Cincinnati area; (2) Hilltop and Marquette violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by conspiring to monopolize the ready-mix concrete market; (3) Hilltop and Marquette violated Section 1 of the Sherman Act, 15 U.S.C. § 1, by conspiring to restrain trade; and (4) Hilltop and Marquette violated state antitrust laws.

At the close of Richter's case, both defendants moved for directed verdicts pursuant to Rule 50 of the Federal Rules of Civil Procedure. Senior District Judge Timothy S. Hogan granted these motions from the bench and later issued an extensive opinion and order detailing the reasons for his decision.[1] On appeal, Richter contends that its claims should have gone to the jury. For the reasons stated below, we affirm the judgment of the district court.

## I

While the relevant time period for Richter's antitrust claims against Hilltop and Marquette is 1972–74, it is necessary to address events prior to 1964 in order to understand this action.

During the years 1961–63, the Richter Concrete Company (a predecessor to the plaintiff), and Hilltop[2] were the two largest producers of ready-mix concrete in the Cincinnati market, with each having an approximate market share of 31%. During that same time period, Marquette supplied cement to various ready-mix concrete producers in the area, including Richter and Hilltop.

In early 1964, Richter was acquired by a wholly-owned subsidiary of the Mississippi River Fuel Corp. (River Fuel), a large conglomerate which had recently entered the cement production industry. The acquisition alarmed both Hilltop and Marquette. Hilltop feared that the financial power of a large national corporation such as River Fuel would strengthen Richter's position in the market and cut into Hilltop's market share. Marquette's concern was more immediate—since Richter's new parent company also owned a cement producer, Marquette would certainly lose a major buyer in the Cincinnati market.

As a result of their respective concerns, Hilltop and Marquette entered into negotiations in 1964 whereby Hilltop sought to strengthen its financial position and increase its market share, and Marquette sought to assure itself of a buyer for its cement. The parties eventually reached an agreement (the 1964 Agreement) which provided that: (1) Marquette would guarantee certain loans in order to allow Hilltop to make necessary improvements; (2) Marquette would supply and Hilltop would purchase from Marquette at least 37.5% of Hilltop's cement requirements at market prices; and (3) Marquette would bear one-half of Hilltop's total pre-income tax operating losses sustained over a three-year pe-

---

1. The district court's opinion may be found at 547 F.Supp. 893.

2. Hilltop Concrete Co. was comprised of several divisions, one of which was the Greater Cincinnati ready-mix division. All references to Hilltop are to the Greater Cincinnati division except where noted.

riod. With regard to this loss-makeup provision, it is important to note that Hilltop had to suffer losses company-wide before the provision could be invoked. For example, if the Cincinnati ready-mix division suffered a loss but the company enjoyed an overall profit, no reimbursement would be paid.

With the loans guaranteed by Marquette, Hilltop enjoyed a prosperous five year period with its share of the Cincinnati market growing to a high of 44% in 1969. Richter did not fare as well during the same period. In 1967, the Federal Trade Commission ruled that the acquisition of Richter by River Fuel violated the Clayton Act and River Fuel was ordered to sell Richter. The company was finally sold in 1972 and, in that same year, began operations in the form in which it brought this suit. Between 1964 and 1972, the plaintiff's predecessor, under the ownership of River Fuel, had seen its share of the Cincinnati market decrease from 27% to 17%.

Therefore, the competitive situation in 1972 had changed considerably from what it had been in 1964. Richter was now under new management and was no longer a dominant force in the market while Hilltop appeared to be as strong as ever. Richter, in its new form, was also no longer a captive customer for cement. The change in the market led Marquette to seek to withdraw from the 1964 Agreement with Hilltop. Whereas Marquette found the 1964 Agreement to be burdensome in 1972, Hilltop was not willing to make substantial changes. The loan guarantees and the loss-makeup provision (though never invoked) provided Hilltop with financial stability. Hilltop did agree, however, to reduce its cement purchases from Marquette, since Marquette found the requirement that it sell 37.5% of Hilltop's cement needs to be unprofitable.

For the relevant time period of October 1972 (when "new" Richter, the plaintiff in this action, entered the market) to July 1974, the Cincinnati ready-mix concrete market was fiercely competitive. Entry into the market, at least on a small level, was fairly easy and this fact further sharpened already keen competitive bidding. The influx of non-union companies into the market further increased price competition as these companies were able to under-bid union companies such as Hilltop and Richter.

Hilltop and Richter both sold their concrete at a price below their average total costs during the relevant time period. Richter sold its concrete at an average price of $19.95 per cubic yard while incurring an average total cost of $22.39 per cubic yard. Hilltop sold its concrete at an average price of $18.80 per cubic yard while incurring an average total cost of $19.88 per cubic yard. The parties stipulated that although Hilltop was selling at a price below average total cost, its price was above average variable cost.[3]

As might be expected from the fact that they sold their product below average total cost, both Hilltop and Richter lost money during the relevant time period. These losses were further exacerbated by a strike by mixer drivers in the summer of 1974. The new Richter company, which had lost money under River Fuel's management and continued to lose money in its new form, publicly announced its closing in August 1974. In announcing its closing, Richter blamed high costs, labor disputes and low sales volume for its failure. Hilltop's losses in Cincinnati during that same time period were great enough to cause a company-wide loss for the three-year period. Accordingly, in late 1974, Hilltop invoked the loss-makeup provision of the 1964 Agreement for the first time. Following litigation between Marquette and Hilltop, the loss-makeup provision was held to be valid and Marquette paid one-half of Hilltop's losses for the three-year period.

3. Average variable cost includes items such as materials, fuels, labor and maintenance. Average total cost simply adds fixed, or long run, costs to variable costs. *Northeastern Telephone Co. v. American Telephone and Telegraph Co.*, 651 F.2d 76, 86–87 (2d Cir. 1981), *cert. denied*, 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982).

During the period 1972–74, Hilltop's market share in the Cincinnati market dropped from 40% to 30%. By 1977, its market share had declined to 20% and Hilltop, like Richter before it, sold its assets.

## II

The issue before the court is whether the district court correctly directed verdicts in favor of the defendants. The standards for considering a directed verdict are well-settled. The court is "bound to view the evidence in the light most favorable to [the non-moving party] and to give it the benefit of all inferences which the evidence fairly supports, even though contrary inferences might reasonably be drawn." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 696, 82 S.Ct. 1404, 1409, 8 L.Ed.2d 777 (1962). If the plaintiff "does not present enough evidence within his case-in-chief to support a reasonable finding in his favor, a district court has a duty to direct a verdict in favor of the opposing party." *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1139–40 (9th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 500, 42 L.Ed.2d 298 (1974).

These principles apply to antitrust actions as equally as they apply to all civil actions. Nonetheless, summary procedures are not usual in antitrust cases, in part because of what the fifth circuit has dubbed the "facile notion" that such cases are typically unsuited for summary procedures. *Aladdin Oil Co. v. Texaco, Inc.*, 603 F.2d 1107, 1110–12 (5th Cir. 1979). This view has evolved as a result of the Supreme Court's statement in *Poller v. Columbia Broadcasting System*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962):

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. (footnote omitted).

In *Poller* the Supreme Court reversed the granting of a summary judgment, not the directing of a verdict. Although both summary judgment and directed verdict may be termed summary procedures, the policy reasons for frowning upon summary judgments in antitrust cases are not present to the same degree when a verdict is directed. Antitrust cases are usually extremely factual; it may be rare that such a case can be disposed of as a matter of law without factual determinations having to be made. Before a verdict is directed, however, the plaintiff has had the opportunity to air fully the facts most favorable to its case.

In a number of cases courts have either directed verdicts or upheld the directing of verdicts in antitrust actions based, like the instant action, on predatory pricing or attempted monopolization claims. *See, e.g., Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427 (7th Cir. 1980); *California Computer Products, Inc. v. International Business Machines Corp.*, 613 F.2d 727 (9th Cir. 1979); *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848 (9th Cir. 1977), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hanson v. Shell Oil Co.*, 541 F.2d 1352 (9th Cir. 1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *Mowery v. Standard Oil Co. of Ohio*, 463 F.Supp. 762 (N.D.Ohio) *aff'd without opinion* 590 F.2d 335 (6th Cir. 1976); *ILC Peripherals Leasing Corp. v. International Business Machines*, 458 F.Supp. 423 (N.D.Cal.1978), *aff'd sub nom. Memorex Corp. v. International Business Machines Corp.*, 636 F.2d 1188 (9th Cir. 1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). Similarly, courts have directed verdicts in claims of conspiracy to monopolize. *See, e.g., Comfort Trane Air Conditioning Co. v. Trane Co.*, 592 F.2d 1373 (5th Cir. 1979).

Viewing the evidence in the light most favorable to Richter, we find that Richter did not present evidence sufficient for a reasonable trier-of-fact to conclude that the defendants had violated the antitrust laws. Consequently, the trial court was correct in directing a verdict in the defendants' favor.

### III

Richter's antitrust theory is that Hilltop possessed superior market strength as a result of its 40% market share and its 1964 agreement with Marquette. Using this strength, Hilltop sold concrete at a loss with the specific intent of driving Richter and others out of the concrete market in the greater Cincinnati area. Once it had routed the competition, Hilltop planned to raise prices to a monopoly level.

To prove its claim of attempted monopolization, Richter has to prove that Hilltop had engaged in anticompetitive conduct with the specific intent to monopolize and that the attempt had a dangerous probability of success. *United States v. Dairymen, Inc.,* 660 F.2d 192, 194 (6th Cir. 1981).

██ Anticompetitive conduct is conduct designed to destroy competition, not just to eliminate a competitor. Lively legal competition will result in the efficient and shrewd businessman routing the inefficient and imprudent from the field. The antitrust laws must be administered in such a way that they do not restrain such vigorous competition in order to protect inefficient competitors. As Judge Learned Hand has pointed out, "The successful competitor, having been urged to compete, must not be turned upon when he wins." *United States v. Aluminum Company of America,* 148 F.2d 416, 430 (2d Cir. 1945). Merely to attempt to succeed in business is not anticompetitive conduct.

██ The anticompetitive conduct that Richter alleges the defendants engaged in is predatory pricing. Pricing is predatory when a company foregoes short-term profits in order to develop a market position such that the company can later raise prices and recoup profits. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1031 (9th Cir. 1981). Preda-

tory pricing differs from healthy competitive pricing in its motive: "a predator by his pricing practices seeks 'to impose losses on other firms, not garner gains for itself.'" *Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 853–54 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981) (footnote omitted). Price reductions that constitute a legitimate, competitive response to market conditions are not predatory. *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1031–32 (9th Cir. 1981).

In order to determine whether the motive behind a pricing policy is anticompetitive or competitive, scholars have advocated and several courts have adopted an economic, cost-based test. The leading advocates of such an objective cost-based test to determine subjective intent in the absence of direct evidence of such intent have been professors Areeda and Turner. *Predatory Pricing & Related Practices Under Section 2 of the Sherman Act,* 88 Harv.L.Rev. 697 (1975).[4]

Areeda and Turner suggest that prices below marginal or average variable cost should be presumed predatory; and those above marginal or average variable cost presumed nonpredatory. This approach has been adopted by a number of courts, in large part because of its ease of application. *See, e.g., Northeastern Telephone Co. v. American Telephone and Telegraph Co.,* 651 F.2d 76 (2d Cir. 1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). Other scholars and courts have accepted the use of marginal or average variable cost as a factor in determining whether pricing is predatory but have allowed for consideration of other factors indicative of predatory intent. *See, e.g., William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014 (9th Cir. 1981); *Chillicothe Sand & Gravel Co. v. Martin Marietta*

---

**4.** The initial Areeda-Turner article started a scholarly debate on predatory pricing. *See, e.g.,* Scherer, *Predatory Pricing and the Sherman Act: A Comment,* 89 Harv.L.Rev. 869 (1976); Areeda & Turner, *Scherer on Predatory Pricing: A Reply,* 89 Harv.L.Rev. 891 (1976); Scherer, *Some Last Words on Predatory Pric-*

*ing,* 89 Harv.L.Rev. 901 (1976); Williamson, *Predatory Pricing: A Strategic and Welfare Analysis,* 87 Yale L.J. 284 (1977); Areeda & Turner, *Williamson on Predatory Pricing,* 87 Yale L.J. 1337 (1978); and Schmalensee, *On the Use of Economic Models in Antitrust: The Realemon Case,* 127 U.Pa.L.Rev. 994 (1979).

*Corp.,* 615 F.2d 427 (7th Cir. 1980); *Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.,* 551 F.2d 790 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

The parties in the instant case stipulated that during the relevant time period Hilltop was selling above its marginal or average variable cost.[5] Thus, under the Areeda-Turner test, Richter's proof would be totally deficient. However, the district court adopted the test more favorable to Richter, holding that:

> [A] firm that prices its product above average total cost is not engaged in predatory pricing; a firm that prices its product below marginal or average variable cost presumptively is. A firm that prices its product above marginal or average variable cost, but below average total cost may not be engaged in predatory pricing, and proof that it is must come from independent evidence that such pricing is 'unreasonable' or intended to destroy competition.

547 F.Supp. 893.

It is unnecessary for us to choose between the Areeda-Turner test and the one set out by the district court since we find Richter's case to be seriously flawed under either standard.[6] For the purposes of this opinion, we will follow the district court's approach, and consider whether Richter introduced evidence of other factors tending to show predatory pricing.

■ One such factor is whether or not barriers to entry in the relevant market are high. *See Hanson v. Shell Oil Co.,* 541 F.2d 1352 (9th Cir. 1976), *cert. denied,* 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); *ILC Peripherals v. International Business Machines Corp.,* 458 F.Supp. 423 (N.D.Cal. 1978), *aff'd sub nom. Memorex v. International Business Machines Corp.,* 636 F.2d 1188 (9th Cir. 1980), *cert. denied,* 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). The existence of high entry barriers is significant in determining the existence of predatory intent, inasmuch as only where such barriers exist will there be incentive to price predatorily. For where entrance barriers are low, a firm may depress prices and drive competitors from the field only to find its market invaded by a host of new competitors. *Northeastern Telephone Co. v. American Telephone and Telegraph Co.,* 651 F.2d 76, 89 (2d Cir. 1981), *cert. denied,* 455 U.S. 943, 102 S.Ct. 1438, 71 L.Ed.2d 654 (1982). The evidence introduced in the instant case was that entrance barriers to the concrete market in Cincinnati were relatively low, as evidenced by the number of new companies continually entering the market.

The district court also considered whether there were any other factors which were

5. Because of the difficulty of assessing marginal cost, the district court substituted average variable cost as a rough equivalent. This substitution is in accordance with the Areeda-Turner test and neither party challenges the propriety of this substitution.

6. Earlier this year, this court likewise refused to adopt any test for predatory pricing. *Borden, Inc. v. Federal Trade Commission,* 674 F.2d 498 (6th Cir. 1982). In that case, Borden was found to be predatorily pricing by setting its prices below average total cost. *Borden,* however, rests upon the particular circumstances present in that case and does not stand for the proposition that merely proving that a company sets its price below average total cost is sufficient to support an inference of predatory pricing. *Borden* is distinguishable from the instant case in several important respects. First, the charge of predatory pricing brought against Borden was very different from the claim made against Hilltop. Borden was al-legedly charging lower prices in areas of stiff competition and absorbing any losses by raising prices in areas of low competition. *Id.* at 514. This case, on the other hand, involves a claim that Hilltop predatorily prices within a single market in the hope of eventually gaining a monopoly within that market. Second, Borden was clearly the dominant firm in its market with a market share of approximately 90%. Hilltop's market share for the relevant period declined from approximately 40% to approximately 30%. Third, *Borden* presented a case of high entry barriers due to a strong consumer preference for Borden's product. In the instant case, the district court found that entry barriers to the ready-mix concrete industry were not high. Finally, Borden was found to have made its pricing policy with the intent to eliminate competition while no evidence of such intent on Hilltop's part was introduced by Richter in this case.

independent evidence of Hilltop's intent to forego short-run profits. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427 (7th Cir. 1980). Richter alleged that two other factors indicated Hilltop's predatory intent—the 1964 Agreement and the fact that Hilltop first began operating at a loss at the time that new Richter entered the market. The district court found that these factors did not raise a reasonable inference of intent to forego short-run profits. We agree.

Richter contends that the provisions of the 1964 Agreement—particularly the loss-makeup provision—increased Hilltop's financial strength. About that there is no dispute. But any action that increases a firm's financial strength does not *ipso facto* raise an inference of predatory intent. It is not reasonable to assume that because it might recover 50% of its losses, Hilltop intentionally incurred an overall loss in all its divisions for a period of three years in order to drive Richter out of business in the Cincinnati market. By 1972, Hilltop knew that Marquette would not voluntarily comply with the loss-makeup provision and, in fact, the validity of the provision was not determined until 1979. Under these circumstances, it is doubtful that Hilltop derived much business comfort from the agreement in 1972. We find that the jury could not have reasonably inferred that Hilltop intended to price predatorily in 1972 based solely on the existence of the 1964 Agreement.

We likewise find that the fact that Hilltop first began to lose money in 1972 is not particularly significant; for even though this is when Richter was reorganized, Richter had always been one of Hilltop's competitors. Richter was not a new entrant into the market, suddenly challenging Hilltop's position. The only reasonable inference which may be drawn from the evidence is that Hilltop began losing money because of an increasingly competitive market, a fact totally unrelated to Richter's reorganization.

Economic tests, such as those suggested by Areeda-Turner and their critics, provide useful tools for analyzing predatory pricing cases. However, it is important for courts to keep in mind that the main purpose of the antitrust laws is to preserve and promote competition. Whether or not a particular practice violates the antitrust laws is determined by its effect on competition, not its effect on a competitor. *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.,* 615 F.2d 427, 431 (7th Cir. 1980); *Pacific Engineering & Production Co. of Nevada v. Kerr-McGee Corp.,* 551 F.2d 790, 795 (10th Cir.), *cert. denied,* 434 U.S. 879, 98 S.Ct. 234, 54 L.Ed.2d 160 (1977).

Focusing on this factor exposes the critical flaw in Richter's predatory pricing claim—Richter did not introduce any evidence tending to establish that Hilltop's pricing below average total cost had any effect whatsoever on the market that Hilltop was allegedly attempting to monopolize.

Richter relied almost exclusively on the testimony of its expert to prove its claim that Hilltop had engaged in predatory pricing. His conclusion that Hilltop had done so was based strictly on a comparison of Richter's costs and prices to Hilltop's costs and prices. He reasoned that Hilltop could have raised its prices to a level equal to its average total cost and still have been below Richter's prices. He then inferred Hilltop's predatory intent from its failure to raise its prices. Although the failure to raise prices to a level equal to average total cost may have been indicative of predatory pricing had Richter and Hilltop been the only competitors in the market, it was meaningless in the context of the very competitive Cincinnati concrete market.

Richter's theory that Hilltop could have raised prices does not take into account whether Hilltop could have done so and remained competitive. Richter's expert admitted that he had not analyzed the costs and prices of other competitors in the market and that he had no opinion on whether Hilltop could have raised prices without losing sales. The evidence in the record, however, indicates that Hilltop could not have done so. In fact, one price increase by Hilltop caused it to lose twenty competitive bids in a row.

The evidence in the record also indicates that Hilltop's prices, while lower than Richter's were not the lowest in the market. The evidence further indicates that Hilltop's costs, like Richter's, were higher than many competitors because its employees were unionized while those of some of the other companies were not.

In sum, we find that the only reasonable inference to be drawn from the evidence is that Hilltop priced below its total cost in order to meet its competitor's prices. It is not anticompetitive for a company to reduce prices to meet lower prices already being charged by competitors. Indeed, "[t]o force a company to maintain non-competitive prices would be to turn the antitrust laws on their head." *ILC Peripherals v. International Business Machines Corp.*, 458 F.Supp. 423, 433 (N.D.Cal.1978), aff'd sub nom. *Memorex v. International Business Machines Corp.*, 636 F.2d 1188 (9th Cir. 1980), *cert. denied*, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981). We accordingly find that the plaintiff failed to introduce sufficient evidence to allow a jury reasonably to infer that Hilltop engaged in anticompetitive conduct.[7]

The second element of attempted monopolization is the specific intent to monopolize. Since specific intent is also integral to predatory pricing, we have essentially discussed the issue already. To recap, specific intent may be shown by direct evidence or inferred from anticompetitive acts. Richter introduced no direct evidence of intent to monopolize. Evidence was introduced that Hilltop wanted to increase its market share. Such is the normal desire of competitors; it does not reveal intent to monopolize. *U.S. Steel Corp. v. Fortner Enterprises, Inc.*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977). Further, since we have found that Hilltop did not engage in anticompetitive conduct, we can infer no intent to monopolize from its actions.

The third element of attempted monopolization is a dangerous probability of success. The greater a firm's market power the greater the probability of successful monopolization. In order to be found liable for attempted monopolization, a firm must possess market strength that approaches monopoly power—the ability to control prices and exclude competition.

Market strength is often indicated by market share. During the relevant period, Hilltop's market share declined from approximately 40% to approximately 30%. Given the facts of the case, such a share is not sufficient to establish Hilltop's capacity to monopolize. *See United States v. Empire Gas Corp.*, 537 F.2d 296 (8th Cir. 1976), *cert. denied*, 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977) (50% market share does not establish dangerous probability of success); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255 (7th Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982) (30% market share is not enough). The fact that Hilltop's share of the market was declining also belies whatever inference of capacity to monopolize that may be drawn from the size of its market share. *Forro Precision, Inc. v. International Business Machines Corp.*, 673 F.2d 1045, 1058 (9th Cir. 1982); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 271 (7th Cir. 1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982); *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 841 (2d Cir. 1980).

Market share alone, however, is not enough to determine a firm's capacity to achieve monopoly. *Broadway Delivery Corp. v. United Parcel Service of America, Inc.*, 651 F.2d 122, 126–29 (2d Cir.), *cert. denied*, 454 U.S. 968, 102 S.Ct. 512, 70

---

**7.** On appeal, Richter contends that the district court erred in focusing exclusively on predatory pricing. Richter contends that the attempted monopolization claim may be proven through any anticompetitive conduct. While this is a correct statement of the law, the plaintiff's argument is without merit since it has relied on the predatory pricing claim from the inception of this action. In focusing on the predatory pricing claim, the district court simply ruled on the case as it was presented to it. In any event, Richter alleges no such other anticompetitive acts which were not considered by the district court.

L.Ed.2d 384 (1981). The real test is whether Hilltop possessed sufficient market power to achieve its aims. We find that it did not. Hilltop lacked the power to control prices. Twice during the relevant period it raised prices but then rescinded these increases because of lost sales. The undisputed evidence showed that Hilltop followed price changes initiated by other firms. Indeed, Richter's own expert witness testified that the ready-mix concrete market was highly competitive. This contradicts the claim that one firm was able to control prices. Hilltop also lacked the power to exclude competition. At any given time during the relevant period, it had approximately 24 competitors. Entry into the industry was fairly easy as was evidenced by the fact that several new companies entered the market.

In sum, the only reasonable inference which may be drawn is that Hilltop lacked sufficient market power to create a dangerous probability of success. Consequently, we find that the district court did not err in directing a verdict on the attempted monopolization claim, for in regard to each element of the claim, Richter's proof was deficient.

### IV

Richter also asserts claims of conspiracy to monopolize and restraint of trade. We find these claims likewise to be without merit.

 In order to prove that Hilltop and Marquette engaged in a conspiracy to monopolize, Richter would have had to prove both an existence of conspiracy and specific intent to monopolize. *Fleer Corp. v. Topps Chewing Gum, Inc.,* 658 F.2d 139 (3d Cir. 1981), *cert. denied,* 455 U.S. 1019, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). As we discussed above, Richter failed to prove that Hilltop had the specific intent to monopolize the ready-mix concrete market through predatory pricing. Richter introduced no evidence indicating that Marquette had such an intent. Moreover, the agreement between the parties does not reflect predatory intent. Neither does the agreement

show the existence of a conspiracy in 1972–74. It is not reasonable to assume that Hilltop and Marquette conspired in 1964 to drive Richter out of business in 1972. In addition, there is no evidence of any further agreement or any communication between the parties regarding pricing during the relevant period. Indeed, the evidence is that during this time Marquette was attempting to extricate itself from the 1964 agreement.

 In order to prevail on its Section 1 claim of restraint of trade, Richter would have had to show the existence of a contract, combination or conspiracy affecting interstate commerce which imposed an unreasonable restraint of trade. For a restraint to be unreasonable it must have an anticompetitive effect. *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1183 (D.C.Cir.1978). Richter showed that a contract—the 1964 Agreement—existed between Hilltop and Marquette that affected interstate commerce and restrained trade (at least insofar as it required Marquette to supply Hilltop with 37.5% of its cement requirement). Richter, however, failed to show that the agreement had an anticompetitive effect.

### V

Richter also raises several other claims on appeal. First, it contends that the district court erred in directing a verdict on its state antitrust claims. Richter did not brief this issue nor did it argue it at oral argument and we find no merit in this claim. Second, Richter challenges the exclusion of certain evidence by the district court. We find no error. Even if such evidence was erroneously excluded, we would find any error to be harmless. Finally, Richter claims that the district judge was biased based on comments made during the trial. We find this claim to be totally without merit.

### VI

For the reasons stated above and in the thorough and well-reasoned opinion of Senior District Judge Hogan, which we hereby

adopt, the judgment of the district court is AFFIRMED.