716 F.2d 903
 1983-2 Trade Cases 65,595
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
L. & L. Howell, Inc.
v.
Cincinnati Cooperative Milk Sales Association, et al.
 Nos. 81-3491 and 81-3492.
 United States Court of Appeals, Sixth Circuit.
 Filed July 20, 1983.
 
 1
 Before: JONES and WELLFORD, CIRCUIT JUDGES, and ALLEN, DISTRICT JUDGE.*
 
 Order
 
 2
 The defendants in this appeal, two dairy cooperatives, seek review of the district court's entry of judgment against them on a claim by a milk hauler for violation of Section 1 of the Sherman Antitrust Act. They assert that their actions in contracting with the plaintiff milk hauler, even if alleged to be at an unreasonable low "predatory" price, were exempt from antitrust liability under the Capper-Volstead exemption, and they seek reversal of the judgment below rendered for plaintiff. We find that the district court erred in failing to direct a verdict in favor of the defendant cooperatives under the circumstances made clear at the conclusion of the proof.
 
 
 3
 Plaintiff, L. & L. Howell, Inc. (Howell), is a closely held corporation engaged in milk hauling and based in Greenville, Ohio. Howell picks up milk from the farms of milk producers and delivers it to designated buyer dairy processors. The members of the defendant dairy cooperatives are the farmers from whom Howell picks up milk. Howell hauled milk for both of the defendant cooperatives, Miami Valley Milk Producers Association (Miami Valley) and the Cincinnati Cooperative Milk Sales Association (Cincinnati Cooperatives). During the period in question, 80%-85% of the farmers in the area in which plaintiff Howell hauled milk were members of one of the defendant cooperatives. The defendants were competitor cooperatives, who combined to seek more favorable rates for the milk produced by their members.
 
 
 4
 Prior to May, 1972, Howell picked up milk from the farms of members of the Cincinnati Cooperative and delivered it to the Westernville Creamery in Covington, Ohio. Howell also picked up milk from members of the Miami Valley and hauled it to Dayton, Ohio. Since the milk for each cooperative was to go to different locations, each cooperative had a policy of not permitting a milk hauler to commingle milk collected from members of one cooperative with the milk of members from another cooperative. Plaintiff Howell was therefore required to send different trucks to the members of each cooperative to gather milk in the same general geographic area, but there was no combination or concert of action to bring about this result.
 
 
 5
 In May, 1972, both defendant cooperatives decided to make a common arrangement to transport their milk from the area previously served by Howell to a common customer, Kroger's processing plant near Cincinnati. They arranged a meeting with plaintiff Howell to discuss this new plan of operation. In this meeting they jointly proposed that Howell stop hauling milk to Covington and Dayton and begin to haul milk to Kroger's processing plant near Cincinnati, a longer haul than plaintiff had previously been making. To compensate for the additional distance, the cooperatives agreed to allow Howell to commingle the members' milk, since they were going to the same destination, and, in addition, Howell would be paid an additional nickel per hundred weight of milk.
 
 
 6
 Howell initially agreed to the arrangement on a trial basis, since he was unsure whether the additional price he would receive together with savings from commingling would offset the additional expense. Approximately a year and a half later, in November, 1973, Howell entered into a written agreement with the defendant cooperatives, formally effectuating this arrangement, which was renewable annually. During this period, and thereafter in 1974 and in 1975, Howell told defendants that the savings realized did not cover the increased cost of the arrangement. He sought a higher price, or a return to the original arrangement, but the defendant cooperatives refused to alter the agreed terms. Howell continued to haul the milk, but subsequently filed, in September, 1976, this action against the cooperatives, alleging, inter alia, violations of the Sherman Act. That complaint purported to assert violations of Sections 1 and 2 of the Sherman Act, and Section 3 and 7 of the Clayton Act (15 USC Secs. 14 and 18, respectively), as well as a claim for quantum merit. All of those theories, except for the claims under Sections 1 and 2 of the Sherman Act, were abandoned by plaintiff or dismissed by the court prior to or during trial. These appeals only involve the claims under Section 1 and Section 2.
 
 
 7
 At trial, Howell contended that the two defendant cooperatives had such combined market power in the geographic area in which Howell could haul milk that they could set and maintain the prices paid Howell for hauling their members' milk. He argued that the price set by the cooperatives was at a "predatorily" low level, below the fair and reasonable market level for his services. Howell maintained the combined market power of the cooperatives was such that he was required to perform those services at the low price if he was to continue hauling milk in that geographic area. Under this rationale, he claimed a violation of Section 1 of the Sherman Act (15 USC Sec. 1) arguing that the cooperatives had agreed between themselves to impose a "predatory" price for Howell's services, thereby constituting an unlawful contract or conspiracy. He also contended that the cooperatives' actions violated Section 2 of the Sherman Act, prohibiting an unlawful monopoly or unlawful use of monopoly power, in that the two cooperatives together represented virtually all of the farmers in the area. Under these circumstances, Howell maintained, he was required to accept the unreasonably low or "predatory" price or suffer grievous economic consequences.
 
 
 8
 The defendant cooperatives relied at trial primarily on the Capper-Volstead exemption to the Sherman Act, 7 USC Sec. 291, which provides that producers of agricultural products may act together in cooperatives in collectively processing, handling and marketing their products, and that they may make any necessary contracts to effect their purposes.
 
 
 9
 The trial court stated during trial that it would direct a verdict for the cooperatives on the issue of conspiracy, since the plaintiff's case was "complete" whether there were one or two contracts and because it found no evidence that the two cooperatives illegally conspired. On this appeal, Howell contends that this was error. The cooperatives claim that although the trial court stated that it would not charge the jury on the issue of conspiracy, it in fact erroneously did so in its instructions to the jury.
 
 
 10
 On April 24, 1981, the jury returned a verdict for plaintiff Howell in the amount of $136,000 for "lost profits." In this action, the defendant cooperatives appeal the district court's failure to direct a verdict in their favor on the basis of the claimed Capper-Volstead exemption to the monopoly and conspiracy claims. Plaintiff Howell appeals the decision to direct a verdict on the issue of conspiracy.
 
 
 11
 The Capper-Volstead exemption to antitrust liability provides:
 
 
 12
 Persons engaged in the production of agricultural products ... may act together in associations, corporate or otherwise, with or without capital stock, in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products or persons so engaged. Such associations may have marketing agencies in common; and such associations and their members may make the necessary contracts and agreements to effect such purposes.
 
 
 13
 7 USC Sec. 291. This exemption was discussed by the Supreme Court in Maryland & Virginia Milk Producers Association v. United States 362 U.S. 458, 465-67 (1960). The Court there stated that the language of the Capper-Volstead exemption showed no more than a purpose to allow farmers to act together in cooperatives without such actions being held illegal combinations in restraint of trade. Under the exemption, such entities cannot be restrained from lawfully carrying out their legitimate objectives. The Court cautioned, however, that Capper-Volstead does not give cooperatives "full freedom to engage in predatory trade practices at will." In particular, the Act did not leave cooperatives free to engage in unlawful practices against other persons in order to monopolize trade or to restrain or suppress competition with the cooperative. 362 U.S. at 365-67. In Milk Producers, the defendant cooperatives engaged in illegal monopolization by compelling dealers to purchase milk from them. In addition, they conspired to eliminate competition from other cooperatives. The Supreme Court stated that while it was permissible for a cooperative to act to advance its processing and marketing business, it was not permissible for it to seek to eliminate competitors.
 
 
 14
 In a subsequent decision, Sunkist Growers, Inc. v. Winkler & Smith Co., 370 U.S. 19, 28 (1962), the Court stated that the 12,000 growers involved in that case could have ultimately joined together in one organization for the collective processing and marketing of their fruit products. The language of the Capper-Volstead Act, the Court stated, specifically permits concerted efforts by farmers "in the processing, preparing for market, and marketing of their products." 370 U.S. at 28.
 
 
 15
 This Court discussed the Capper-Volstead exemption in United States v. Dairymen, Inc., 660 F.2d 192 (6th Cir.1981). In Dairymen, the defendant cooperative was accused of forcing milk processors to execute full supply and committed supply contracts to eliminate competitors in violation of Section 3 of the Clayton Act. In order to secure these agreements, the cooperative threatened to withhold milk from several processors. The cooperative claimed the Capper-Volstead Act as a defense.
 
 The Court in Dairymen stated:
 
 16
 The Capper-Volstead Act was intended to permit agricultural producers to join together to process, prepare and market agricultural products without fear of prosecution under the antitrust laws. It permits an agricultural cooperative to be formed solely to fix the prices at which its members['] products are sold.... Two or more cooperatives can voluntarily join together solely for the purpose of setting uniform prices for their members.... As a result, an agricultural cooperative can willfully attain a monopoly through the voluntary combination with other cooperatives. The mere accretion of monopoly power through voluntary combination is immunized by the Capper-Volstead Act.
 
 
 17
 660 F.2d at 194 (citations omitted) (footnotes omitted). The Court emphasized that the most important inquiry in that case was whether the actions of the cooperatives were intended to stifle competition or were intended to meet legitimate business purposes. 660 F.2d at 194-195.
 
 
 18
 Another recent decision by this Court discusses the meaning of the term "predatory pricing," of which plaintiff Howell accuses the defendant cooperatives in the case at bar. In Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 823 (6th Cir.1982), the plaintiff and the defendant were engaged in a concrete "price war"; both sold concrete at a price below their average total cost. The plaintiff accused the defendant of "predatory pricing." The Court stated:
 
 
 19
 Pricing is predatory when a company foregoes short-term profits in order to develop a market position such that the company can later raise prices and recoup profits.... Predatory pricing differs from healthy competitive pricing in this motive: "a predator by his pricing practices seeks 'to impose losses on other firms not garner gains for itself.' "
 
 
 20
 691 F.2d at 823.
 
 
 21
 It is clear in the light of this authority that the defendant cooperatives in this case have not engaged in the type of anticompetitive conduct or abuse of monopoly power that remains prohibited in light of the Capper-Volstead exemption. Rather, the evidence indicates that the only factor "coercing" Howell into accepting the price proposed by the cooperatives was the fact that the cooperatives, between them, had some 80% to 85% of the dairy farmers in that area as members. This near monopoly status is precisely what the Capper-Volstead Act makes lawful, and it would not be unlawful even if defendants controlled 100% of the farmers. The evidence does not suggest that the cooperatives sought to expand their monopoly power by setting the price of milk hauling or eliminating competition among haulers; the cooperatives themselves did not engage in milk hauling and evidenced no intention of doing so. They simply obtained an advantageous price of hauling for the benefit of their members and the cooperatives were free if they wished to award a hauling contract to another milk hauler. Howell was not "required" to accept the proposed price, and they pursued actions made lawful under the Capper-Volstead Act.
 
 
 22
 Furthermore, if Howell was persuaded that the price he had initially agreed upon on a trial basis was too low to effect a profit, he could have refused to sign the written agreement unless the price was raised, or have refused to extend the contract from year to year. Howell apparently made a bad bargain and seeks to utilize the antitrust laws to rectify this unfortunate situation.
 
 
 23
 Decisions by other courts support our conclusion. The Capper-Volstead Act was reviewed at length in Fairdale Farms, Inc. v. Yankeee Milk, Inc., 635 F.2d 1037 (2d Cir.1980). In Fairdale Farms, the plaintiff was both a producer and a dealer-processor of milk. The defendant was a milk producers cooperative. The Second Circuit examined in detail the history, both legislative and otherwise, of the Capper-Volstead exemption. It found that Congress intended the Capper-Volstead Act to be interpreted broadly to aid farmers in marketing their products. This was exemplified by the broad range of activities in which a cooperative might engage, i.e., "processing, preparing for market, handling, and marketing." 635 F.2d at 1040-44. The court found that the only limitation on a cooperative was that it may neither acquire nor exercise monopoly power by using predatory or anti-competitive practices such as picketing and harassment, coerced membership and discriminatory pricing. The court observed that a cooperative may not use its legitimately acquired monopoly power in such a manner as to stifle or smother competition. 635 F.2d at 1044. The court noted further that it is not a violation of the Sherman Act for the members of an agricultural cooperative to carry out the legitimate objectives of their association. 635 F.2d at 1045. Here defendants were effectuating legitimate objectives by obtaining an apparently advantageous hauling arrangement.
 
 
 24
 Other courts have held that milk hauling is encompassed within the activities enumerated in the Capper-Volstead Act. In Green v. Associated Milk Producers, Inc., 692 F.2d 1153 (8th Cir.1982), the court held that the word "handling" in the Capper-Volstead Act included milk hauling. The court noted that it is central to the functions of a dairy cooperative to insure that transportation of the milk takes place properly. See also Treasure Valley Potato Bargaining Association v. Ore-Ida Foods, Inc., 495 F.2d 203 (9th Cir.), cert. denied, 419 U.S. 999 (1974) (court found that the term "marketing" included transporting the product).
 
 
 25
 This court's discussion of activities by a cooperative that remain prohibited under Capper-Volstead in United States v. Dairymen, Inc., supra, was noted with approval in Alexander v. National Farmers Organization, 687 F.2d 1173, 1183 (8th Cir.1982). The Eighth Circuit observed that an agricultural cooperative may lawfully form the intent to monopolize; the impermissible aim is "to pursue monopoly power by eliminating or restraining competition with the co-op through predatory or anti-competitive practices." 687 F.2d at 1183. See also GVF Cannery, Inc. v. Calif. Tomato Growers Association, 511 F.Supp. 711, 715 (N.D.Calif.1981); Kinnett Dairies, Inc. v. Dairymen, Inc., 512 F.Supp. 608, 632-33 (M.D.Ga.1981), appeal docketed, No. 81-7308 (11th Cir.) (heard November 1, 1982, no opinion issued yet).
 
 
 26
 Therefore, it appears that the conduct in which the defendant cooperatives in the present case have engaged remains protected under the Capper-Volstead Act. Proposing a price to plaintiff Howell, even if unreasonably low, is simply not the type of predatory or anticompetitive behavior that courts have found forbidden to dairy cooperatives. Plaintiff Howell was not coerced into accepting the low price to eliminate or restrain competition, and the Capper-Volstead Act protects cooperatives that lawfully acquire and use their monopoly power.
 
 
 27
 In addition, the transcript of the proceedings below indicates that the trial court did not direct a verdict in favor of the defendant cooperatives on the issue of conspiracy, in violation of Section 1 of the Sherman Act; the trial judge in fact instructed the jury on conspiracy and Section 1 of the Sherman Act.[1] Therefore, the judgment of the district court is Reversed and Remanded with directions to dismiss the cause of action against the defendant cooperatives as to Sections 1 and 2 of the Sherman Act.
 
 
 28
 Entered by Order of the Court, John P. Hehman, Clerk.
 
 
 
 *
 Honorable Charles M. Allen, Chief Judge, United States District Court for the Western District of Kentucky, sitting by designation
 
 
 [1]
 The Capper-Volstead exemption applies to Section 1 as well as Section 1 of the Sherman Act. See GVF Cannery, Inc. v. California Tomato Growers Association, Inc., 511 F.Supp. 711, 714 (N.D.Cal 1981)