758 F.2d 654
 1985-1 Trade Cases 66,638
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE, CROSS-APPELLANT,
v.
DAIRYMEN, INC., DEFENDANT-APPELLANT, CROSS-APPELLEE.
 NO. 84-5003, 84-5039
 United States Court of Appeals, Sixth Circuit.
 2/26/85
 
 ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY
 BEFORE: KEITH and JONES, Circuit Judges; and CELEBREZZE, Senior Circuit Judge.
 Per Curiam.
 
 
 1
 Appellant, Dairymen, Inc. (Dairymen), appeals and appellee, the Government, cross appeal from an injunction issued to prevent Dairymen's acts in contravention of Sec. 3 of the Clayton Act.
 
 
 2
 This appeal follows a decision resulting from an earlier remand by a panel of this court. 660 F.2d 192 (6th Cir. 1981) (per curiam). Pursuant to that remand, the district court found for the government on the Clayton Act claim and for Dairymen, Inc. on the Sherman Act claim. Those holdings were followed by injunctions designed to accord appropriate relief. Costs were awarded to the Government.
 
 
 3
 Upon consideration of the issues presented by these cross-appeals, we affirm the opinion and judgment of the district court.
 
 
 4
 * On March 29, 1973, the Government filed a complaint and alleged that Dairymen violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2 (1982), and Section 3 of the Clayton Act, 15 U.S.C. Sec. 14 (1982). On June 1, 1973, Dairymen answered and alleged, essentially, that under the Capper-Volstead Act, 7 U.S.C. Secs. 291, 292 (1982), and under the Agricultural Adjustment Act, 7 U.S.C. Secs. 601-624 (1982), its actions were exempt and immunized from liability. The trial court dismissed all but two portions of the complaint. One portion related to Dairymen's Mississippi pooling practices during 1971; the other portion related to Dairymen's use of hauling contracts that prohibited its haulers from hauling milk produced by non-Dairymen producers when those producers' milk was not comingled with Dairymen's milk. Then, the trial court held that Dairymen's pooling practices and hauling contracts violated Sections 1 and 2 of the Sherman Act. Because Dairymen had discontinued its pooling practices, however, the court issued injunctive relief only to prevent Dairymen's usage of the hauling contracts.
 
 
 5
 The Government appealed 'that portion of its action that alleged that Dairymen . . . attempted to monopolize the market in Grade A milk in the Southeastern United States. [Dairymen] . . . appealed that portion of the district court's judgment which held that it violated Section 3 of the Clayton Act by requiring its milk haulers to enter exclusive hauling contracts'. 600 F.2d 192, 193 (6th Cir. 1981) (per curiam). This Court affirmed, in part, reversed in part, and remanded to the district court to determine (1) whether Dairymen used its full supply and committed-supply contracts and exclusive hauling contracts with the specific intent to monopolize; (2) whether Dairymen intended to stifle competition or to meet legitimate business purposes through its full supply and committed-supply contracts; and, (3) whether Dairymen's full supply and committed-supply contracts foreclosed a substantial share of the market from its competitors and tended to create a monopoly in any line of commerce in violation of Section 2 of the Clayton Act. Id at 195.
 
 
 6
 On remand, the district court found that the relevant geographic submarket constituted the states of Kentucky, Tennessee, Georgia, Mississippi, and, Louisiana. The district court found that although the fast way to measure Dairymen's share of that submarket would be to 'establish the amount of milk produced in that submarket and then weigh the amount of milk pooled on the Federal Order located in that state and sold to handlers,' the Government produced insufficient evidence to allow the court to find 'the amount of milk pooled, together with the amount of milk produced in the relevant geographic submarket . . ..' The trial court also found that the Government demonstrated that Dairymen's acts (anticompetitive pooling practices in Mississippi, illegal hauling contracts in Indiana and Tennessee, brush fire incidents, insistence upon either full supply or committed-supply contracts accompanied by threats to cutoff milk supplies to processors and by statements regarding successful competitive pricing activity) revealed a specific intent to monopolize. The trial court further found that Dairymen's share of the relevant geographic submarket was 60% in 1971 and that it decreased the years immediately following 1971 until 1975 when it was 52.1%.
 
 
 7
 The district court concluded that the Government failed to prove a violation of Section 2 of the Sherman Act because it failed to demonstrate that Dairymen possessed a monopoly or would be successful in establishing a monopoly; the Government, according to the district court, did not show that Dairymen either could control prices in the relevant market or possessed the power to effectively exclude competitors from the market. The district court further concluded that because Dairymen obtained its full supply and committed-supply contracts at the peak of its market share power (59.5% possession of and 50% control over purchase of Grade A milk in the relevant submarket), it violated Section 3 of the Clayton Act. Consequently, the district court found for the Government on the Clayton Act claim and for Dairymen on the Sherman Act claim. Then, the court ordered the appropriate injunctive relief and awarded costs to the Government.
 
 
 8
 Dairymen appeals from the district court's conclusion that it violated Section 3 of the Clayton Act. The Government appeals from the district court's conclusion that it failed to demonstrate violated Section 2 of the Sherman Act. Both appeals are consolidated.
 
 B
 
 9
 Appellate review of the district judge's findings of fact is controlled by the 'clearly erroneous' rule of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 52(a). Consequently, '[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge . . . the credibility of . . . witnesses.' Id. 'A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948); see also Kennedy v. Commissioner, 671 F.2d 167, 174 (6th Cir. 1982) (citing United States v. United States Gypsum Co., 333 U.S. 364 (1948)). Our review of the district judge's conclusions of law, however, is not controlled by the 'clearly erroneous' rule. Instead, we may freely review legal conclusions, ultimate findings of fact, and mixed questions of fact and law. Roth Steel Products v. Sharon Steel Corp., 705 F.2d 134, 143, 143 n.19 (6th Cir. 1983) (indicating that legal conclusions are freely reviewable by appellate court and that questions of fact, and mixed questions of fact and law, which require the application of legal principles, are also freely reviewable).
 
 C
 DAIRYMEN'S CONTENTIONS
 1.
 The trial court stated
 
 10
 The testimony as to the precise shares of the relevant submarket held by these competitors of D.I. has not been forthcoming, and we are unable to delineate exactly how their shares increased or decreased by reasons of the execution of the fully-supply and committed supply contract [sic], except for the inescapable conclusion that the contracts, themselves did eliminate these competitors from the share of the market to which we have previously referred.
 
 
 11
 Dairymen contends that this finding is clearly erroneous because the record on remand contained detailed information as to the percentage of Dairymen's market share in the relevant geographic submarket. In support, Dairymen cites the following figures.
 
 
 12
 1971 60.1%
 
 
 13
 1972 57.9%
 
 
 14
 1973 56.7%
 
 
 15
 1974 54.2%
 
 
 16
 1975 52.1%
 
 
 17
 1976 53.5%
 
 
 18
 1977 52.6%
 
 
 19
 1978 51.8%
 
 
 20
 1979 51.9%
 
 
 21
 1980 49.0%
 
 
 22
 1981 48.6%
 
 
 23
 Dairymen, then contends that to find the percentage of its competitors' market share the trial court only needed to have reversed those findings. According to Dairymen, therefore, the following figures would represent the percentage of its competitors' share of the milk produced in the submarket.
 
 
 24
 1971 39.3%
 
 
 25
 1972 42.1%
 
 
 26
 1973 43.3%
 
 
 27
 1974 45.8%
 
 
 28
 1975 47.9%
 
 
 29
 1976 46.5%
 
 
 30
 1977 47.4%
 
 
 31
 1978 48.2%
 
 
 32
 1979 48.1%
 
 
 33
 1980 51.0%
 
 
 34
 1981 51.4%
 
 
 35
 In direct response to Dairymen's contention the Government argues that the district court's statement was not intended to indicate that post-1971 market share data was absent from the record, but instead was an observation that the court would infer anticompetitive effect in the market as a whole from the substantial percentage of the market foreclosed because there was no credible evidence from which to determine the precise shares of individual competitors or to infer a causal relationship between the figures cited by Dairymen and the contracts at issue.
 
 
 36
 We conclude that the district court was aware of the figures that Dairymen identified as the percentage of its market share of the milk produced in the submarket. In fact, the court identified those same figures, but did not, as Dairymen notes, reverse those figures to determine the percentage of Dairymen's competitors' market share of the milk produced in the submarket. Nevertheless, the district court's statement is not clearly erroneous.
 
 
 37
 Although reversal of the figures that Dairymen and the district court identified as corresponding to the percentage of Dairymen's market share in the submarket yields figures that Dairymen identifies on appeal as corresponding to the percentage of its competitors market shares in the submarket, those figures refer to the percentages of the sum of the market shares of all of Dairymen's competitors and not just the percentage of the market shares of Dairymen's primary competitors. The district court's statement that Dairymen characterizes as being clearly erroneous, however, refers only to the percentage of Dairymen's primary competitors' market shares in the submarket. The strength of that conclusion becomes obvious upon reading two of the district court's statements: the one that Dairymen characterizes as clearly erroneous and the one which preceeds it.
 
 
 38
 Competitors of D.I. consist primarily of N.F.O. and independent milk producers in the states of Kentucky, Tennessee ad [sic] Georgia, whereas in Mississippi and Louisiana, the Gulf Coast dairy producers and independent producers appear to have been the primary competitors. The testimony as to the precise shares of the relevant submarket held by these competitors of D.I. has not been forthcoming, and we are unable to delineate exactly how their shares increased or decreased by reasons of the execution of the full-supply and committed supply contract, except for the inescapable conclusion that the contracts themselves did eliminate these competitors from the shares of the market to which we have previously referred.
 
 
 39
 (emphasis added). Consequently, we are not convinced that a mistake has been committed. The district court's statement refers to the precise shares of Dairymen's primary competitors while reversal of the figures that Dairymen identified as the percentage of its own share yields the sum percentage of the shares of all of Dairymen's competitors.
 
 2.
 
 40
 Dairymen contends that without reviewing the qualitative evidence in the record concerning the competitive effect of its full supply and committed-supply contracts, the district court established an irrebutable presumption of anticompetitive effect based solely upon the quantitative evidence in the record concerning Dairymen's dominance in the submarket. According to Dairymen, the court's establishment of that presumption is in direct contravention of Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320 (1961), because Tampa mandates that the quantitative evidentiary analysis should be followed by the qualitative evidentiary analysis. Moreover, according to Dairymen, because the qualitative evidence in the record demonstrated that Dairymen's full supply and committed-supply contracts neither tended to lessen competition nor tended to create a monopoly, the trial court erred in establishing its ultimate fact--Dairymen violated Section 3 of the Clayton Act. Dairymen, therefore, contends that the district court ignored Tampa's mandates and misapplied the law.
 
 
 41
 We do not believe that the trial court ignored Tampa. Instead, the district court was fully aware of Tampa because it thoroughly analyzed, recited the applicable principles set forth by, and quoted the following significant language from Tampa.
 
 
 42
 To determine substantiality in a given case, it is necessary to weigh the probable effect of the contract on the relevant area of effective competition, taking into account the relative strength of the parties, the proportionate volume of commerce involved in relation to the total volume of commerce in the relevant market area, and the probable immediate and future effects which pre-emption of that share of the market might have on effective competition therein. It follows that a mere showing that the contract itself involves a substantial number of dollars is ordinarily of little consequence.
 
 
 43
 365 U.S. at 329.
 
 
 44
 Moreover, we do not believe that the trial court misapplied Tampa. After quoting the above and other language, the district court analyzed the facts of the instant case. In essence, its analysis is encased in the following statements.
 
 
 45
 Even though there are sound and legitimate reasons for entering into full-supply or committed supply contracts, and even though those contracts contain grandfather clauses, the fact remains that they were contracts which D.I. obtained at a time when it possessed 59.5% of the relevant submarket and the contracts themselves controlled the purchase of almost 50% of the Grade A milk marketed in the relevant submarkets. We believe that the timing of the execution of these contracts, occurring as they did when D.I. was at the peak of its market share power, renders them in violation of Section 3 of the Clayton Act, even though that would not have been had D.I.'s share of the relevant submarket been significantly less.
 
 
 46
 We note that Tampa Electric, supra, calls for an evaluation of the relative strength of the competitors of D.I. as well as its consumers. Competitors of D.I. consist primarily of N.F.O. and independent milk producers in the states of Kentucky, Tennessee and Georgia, whereas in Mississippi and Louisiana, the Gulf Coast dairy producers and independent producers appear to have been the primary competitors. The testimony as to the precise shares of the relevant submarket held by these competitors of D.I. has not been forthcoming, and we are unable to delineate exactly how their shares increased or decreased by reasons of the execution of the full-supply and committed supply contract, except for the inescapable conclusion that the contracts themselves did eliminate these competitors from the shares of the market to which we have previously referred.
 
 
 47
 Those statements reveal that the court engaged in a quantitative analysis of the evidence and discovered that at the time of the full supply and committed-supply contracts executions Dairymen had 59% of the submarket and controlled, through the contracts, 50% of the Grade A milk marketed in that submarket. Those statements also reveal that the district court engaged in a qualitative analysis of the evidence by considering the facts of the instant case under the factors set forth by Tampa's language regarding the substantiality determination.
 
 D
 GOVERNMENT'S CONTENTIONS
 1.
 
 48
 'In order to be found liable for attempted monopolization, a firm must possess market strength that approaches monopoly power--the ability to control prices and exclude competition.' Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818, 826 (6th Cir. 1982) (emphasis added). 'Market strength is often indicated by market share.' Id. As the district court noted, during the relevant period, Dairymen's market share declined from 60% in 1971 to 52.1% in 1975. The fact that Dairymen's market share was declining contradicts whatever inference of Dairymen's capacity to monopolize that may be drawn from the size of its market share.
 
 
 49
 As the district court further recognized, '[m]arket share alone, . . . is not enough to determine . . . capacity to achieve monopoly.' Id. 'The real test is whether Dairymen possessed sufficient market power to achieve its aims.' Id. at 827. In determining this question the district court analyzed Dairymen's ability to control prices and exclude competitors. Then, the court concluded that there was no dangerous probability that Dairymen's attempt to monopolize would be successful because Dairymen's market share declined and because the Government failed to show that Dairymen (1) could control prices in the relevant submarket and (2) had the power to effectively exclude competitors from the market.
 
 
 50
 On appeal the Government contends that the district court conclusion is erroneous as a matter of law. The Government reasons that because the ability to control prices and exclude competitors are factors that establish actual possession of monopoly power and not a dangerous probability of successfully obtaining monopoly power, the district court, in effect, required the Government to prove monopoly power rather than market power. The Government is correct in that monopoly power is 'the power to control prices or exclude competition.' United States v. Grinnell, 384 U.S. 563, 571 (1966); Byars v. Bluff City News Co., 609 F.2d 843, 849 (6th Cir. 1979) (quoting Grinnell); Richter Concrete Corp., 691 F.2d at 826. In determining whether market strength approached monopoly power, however, this court has analyzed capacity to control prices and capacity to exclude competitors. See, e.g., Richter Concrete Corp., 691 F.2d at 827. As a result, we do not believe that the district court required the Government to prove monopoly power. Instead, the district court analyzed Dairymen's market share in light of its ability to monopolize. That is, the district court, as it should have, only compared Dairymen's 'size, performance, and policies to that of other competitors and . . . analy[zed] the market structure.' White & White, Inc. v. American Hospital Supply Corp., 723 F.2d 495, 507 (6th Cir. 1983). That approach was entirely permissible given this Court's previous opinions. Id.; see also Richter Concrete Corp., 691 F.2d at 827.
 
 
 51
 We would like to specifically point out, however, that a decline in a company's market share does not mandate the conclusion that the company lacks the capacity to monopolize. In fact, an increase in price and a concomitant decrease in market share may under some circumstances be evidence of monopoly power. See, e.g., American Tobacco Co. v. United States, 328 U.S. 781 (1946) (monopoly power indicated by defendants' ability to, in the midst of the depression and with sales falling off, increase prices and still reap tremendous profits); Broadway Delivery Corp. v. United Parcel Service of America, Inc., 651 F.2d 122 (2nd Cir.) (50% market share does not mandate conclusion that company lacks monopoly power), cert. denied, 454 U.S. 968 (1981); Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 273 n.11 (2d Cir. 1979) (declining market share not dispositive), cert. denied, 444 U.S. 1093 (1980); United States v. Aluminum Co. of America, 148 F.2d 416, 425 (2d Cir. 1945) ('It is true that, if by raising the price he reduces the amount which can be marketed--as always, or almost always, happens--he may invite the expansion of the small producers who will try to fill the place left open; nevertheless, not only is there an inevitable lag in this, but the large producer is in a strong position to check such competition.'); see also Byers v. Bluff City News Co., Inc., 609 F.2d 843, 851 (6th Cir. 1979) (careful factual analysis of market required). Nevertheless, since the government failed to adduce any evidence on this issue, we AFFIRM.