729 F.2d 1050
 1984-1 Trade Cases 65,905
 ARTHUR S. LANGENDERFER, INC., et al., Plaintiffs-Appellees,
Cross-Appellants,
MacRitchie Materials, Inc., Proposed-Intervenor-Appellant, (81-3115),
v.
S.E. JOHNSON COMPANY, et al., Defendants-Appellants, Cross-Appellees.
 Nos. 80-3705, 81-3065, 81-3114 and 81-3115.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 29, 1982.
Decided March 15, 1984.
 
 John M. Curphey (argued), Jack Zouhary, Robison, Curphey & O'Connell, Toledo, Ohio, M. Neal Rains, Arter & Hadden, Cleveland, Ohio, for defendants-appellants, cross-appellees.
 Thomas Zraik, Reiser, Jacobs, Zraik & Szyperski, Toledo, Ohio, James Porter (argued), Walter J. Rekstis, III, Squire, Sanders & Dempsey, Cleveland, Ohio, for plaintiffs-appellees, cross-appellants.
 Before LIVELY, Chief Judge, WELLFORD, Circuit Judge, and WILHOIT, District Judge.*
 WELLFORD, Circuit Judge.
 
 
 1
 Defendants, S.E. Johnson Company (Johnson) and other affiliated entities (referred to collectively as Johnson Companies), appeal the judgments and orders entered by the district court against them following a unanimous jury verdict for plaintiffs in this private antitrust action for alleged violations of Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. Secs. 1, 2, and Section 7 of the Clayton Antitrust Act, 15 U.S.C. Sec. 18. Plaintiffs, Arthur S. Langenderfer, Inc. (Langenderfer), and its sister company, Northern Ohio Asphalt Paving Co. (NOAP), claimed defendants had combined and conspired to drive plaintiffs out of business by various monopolistic and anticompetitive practices including, but not limited to, predatory pricing and illegal acquisitions. The jury found actual damages of $982,117.00. The district court trebled the damage award to $2,946,351.00 and enjoined future acquisitions and anticompetitive acts, pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. Secs. 15, 26.
 
 
 2
 Defendants contend the district court erred by (1) failing to apply the appropriate legal standard to plaintiff's allegation of predatory pricing; (2) allowing the jury to find a violation of Section 7 of the Clayton Act, 15 U.S.C. Sec. 18, on the basis of purely intrastate acquisitions; and (3) allowing damages for losses suffered outside the relevant market and beyond the statute of limitations period. Langenderfer cross-appeals from the district court's refusal to order divestiture and the refusal to allow post-trial intervention by a company affiliated with Langenderfer. We vacate the judgments below because of prejudicial error on the issues of predatory pricing and intrastate acquisitions.
 
 FACTS
 
 3
 Langenderfer and S.E. Johnson were competitors for many years in the business of supplying "hot-mix,"[1] stone, sand and contracting services for highway construction and repair in northwest Ohio. Most of this work is administered and paid for by governmental bodies which invite competitive bids from paving contractors.[2] Federal and state highway projects are administered by the Ohio Department of Transportation (ODOT) and the Ohio Turnpike Commission (OTC) with substantial use of federal funds.[3] For the purpose of this appeal the parties have stipulated the relevant product and geographic market to be asphalt highway paving contracts awarded by the OTC and ODOT in a thirteen county area of northwest Ohio.
 
 
 4
 Successful bidders must supply all labor, materials, equipment and supervision to do the work at per-unit prices specified in the winning bid. The primary costs in performing paving projects are the cost of materials and the cost of hauling materials to the job site. Contractors attempt to minimize expenses by purchasing materials from the quarry or hot-mix plant closest to the job.[4]
 
 
 5
 Plaintiffs, Langenderfer and NOAP are Ohio corporations with all voting stock owned by Burton R. MacRitchie and his two sons. Langenderfer was in the asphalt paving business for 55 years until it discontinued operations in 1978 due to its inability to compete profitably. Unlike many highway contractors, Langenderfer did not diversify its operations but remained an asphalt paving specialist. While Langenderfer was still in business, NOAP had four hot-mix plants in northwest Ohio. The MacRitchie family also owned MacRitchie Materials, Inc.,[5] which operated a quarry in West Millgrove, Ohio, and supplied stone to two of Langenderfer's hot-mix plants.
 
 
 6
 Defendants are the S.E. Johnson Co. (Johnson), founded as an Ohio corporation in 1929 by Sherman E. Johnson, various associated and subsidiary companies, and John T. Kirkby, the current president of Johnson. Following the Second World War, Johnson established the Maumee Stone Co. and opened a quarry to have an assured source of limestone for road building. The Michigan Stone Co. was set up in 1952 to operate two additional quarries just across the Ohio-Michigan border. With these quarries supplying raw materials and with three hot-mix plants to service the area, Johnson was already the largest asphalt paving contractor in northwest Ohio by the time of Sherman Johnson's death in 1956.
 
 
 7
 Defendant, John T. Kirkby, succeeded Mr. Johnson as president and operating head of the defendant companies. He soon began an ambitious acquisition program, acquiring twelve different companies within a fifteen year period.
 
 
 8
 In 1961, Johnson purchased C.P. Calaway, Inc., an independent bridge contractor. This enabled it to perform its own bridge work rather than subcontracting to other companies.
 
 
 9
 Mr. Kirkby then turned his attention to vertical acquisitions of raw material sources in northwest Ohio. Defendant Maumee Stone acquired the quarries of Wood County Stone & Construction Co. (1961), Lime City Stone Co. (1962), and Auglaize Stone Co. (1965). Maumee Stone opened the Rocky Ridge quarry under a 25-year lease in 1970. In 1974, defendants acquired the Tri-State Sand & Gravel Co., which is described as the most important source of quality sand in northwest Ohio.
 
 
 10
 In the late 1960's Johnson began a series of horizontal acquisitions of asphalt paving competitors. In 1969 Johnson purchased paving equipment from the Price Construction Co., including two hot-mix plants that served three counties to the east of Toledo. When Price moved a third hot-mix plant to Maumee to compete with defendants' operation, Mr. Kirkby offered to buy out Price, but Price agreed not to compete for ten years. Johnson purchased Ohio Engineering Co. in 1970 and thereby acquired three hot-mix plants that served several counties south of Toledo. Fred R. Creager & Sons, a small contractor on the verge of bankruptcy, was purchased in 1971 for $1 and an assumption of liabilities. Johnson bought two plants and certain gravel leases in 1972 from Northwest Materials, Inc., which was being liquidated at the time. Except for Creager, each competitor was a viable, profitable, ODOT-qualified paving contractor. Each company except Northwest Materials was acquired under a contract whereby the sellers agreed not to compete with Johnson for a number of years. In 1979, just prior to the trial below, defendants paid $3.5 million for Union Quarries Co., a profitable competitor that owned a quarry, a hot-mix plant and an asphalt paving business that served three counties in northwest Ohio.
 
 
 11
 Substantial evidence indicated that Kirkby, both individually and as chief officer of Johnson, intended to eliminate competition and dominate the market. In addition to the noncompetition agreements previously mentioned, there was considerable testimony that Kirkby or his agents had threatened or coerced several smaller competitors. Kirkby allegedly told one competitor that if he built an asphalt plant to compete with the Maumee plant, defendants would immediately build a larger facility across the street to drive the competition out of business. Another competitor who planned to build a hot-mix plant was told that defendant would not supply the necessary stone for operation of the plant. On another occasion, Kirkby allegedly said that he did not like Langenderfer or Miller (another competitor) and wanted to run them out of business.
 
 
 12
 Langenderfer presented expert testimony from several economists to the effect that Johnson's acquisitions significantly reduced competition and increased market concentration, thereby creating a monopolistic market structure. Statistical evidence does support this testimony. Defendants' average annual share of ODOT and OTC projects from 1966-1971 was 46.9%, but they took well over half of the available work during the 1972-78 period.[6] Johnson Companies did 75.8% of all turnpike paving in northwest Ohio during this period.
 
 
 13
 In summary, Kirkby expanded operations of the Johnson Companies from two quarries and three hot-mix plants to seven quarries, fourteen hot-mix plants, and three sand pits. The horizontal acquisitions eliminated a noticeable segment of Johnson Companies' competition, and the vertical acquisitions gave defendants a captive supply of stone and sand for its asphalt paving jobs. Furthermore, defendants became primary stone suppliers for the remaining asphalt paving competitors who did not own conveniently located quarries. As Johnson increased its share of the ever decreasing market, it also increased its profitability. From 1970 to 1978, its annual net profits more than doubled--from $1.168 to $2.717 million. During this same period, the Johnson Companies' competitors went from a combined net profit of $655,000 to a combined net loss.
 
 
 14
 Langenderfer's claims of unreasonable restraint of trade in violation of Section 1 of the Sherman Act, monopolization and conspiracy or attempt to monopolize in violation of Section 2 of the Sherman Act, and illegal anticompetitive acquisitions in violation of Section 7 of the Clayton Act were all submitted to the jury. In support of the Sherman Act claims, Langenderfer alleged twelve separate monopolistic acts including, among others, predatory pricing, monopolistic pricing, price discrimination, exclusive dealing, refusals to deal, tying, and profit squeezing. The trial court denied defendants' request for special interrogatories. In returning the general verdict in favor of Langenderfer the jury was not required to specify which portions of the Sherman and/or Clayton Acts were violated nor which of the various alleged monopolistic acts were committed by appellants.
 
 PREDATORY PRICING
 
 15
 In order to recover under Section 2 of the Sherman Act, whether for monopolization[7] or an attempt to monopolize,[8] Langenderfer had to establish that Johnson engaged in some type of prohibited anticompetitive conduct. D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co., 692 F.2d 1245 (9th Cir.1982). Langenderfer alleged several different kinds of anticompetitive acts, but the evidence presented at trial clearly focused on the claim of predatory pricing.[9] As the district court stated in the January 27, 1981, Final Judgment for Injunctive Relief:
 
 
 16
 The major thrust of much of the evidence at trial was aimed at the predatory nature of defendants' bidding on ODOT and OTC projects. At trial, plaintiffs vigorously attempted to show how defendants deliberately excluded competition by bidding low and deliberately sacrificing short term profits for the purpose of driving rivals out of business.
 
 
 17
 Defendants contend that as a matter of law, predatory pricing was not established because Langenderfer presented no evidence that Johnson ever submitted a bid for an ODOT or OTC project at less than cost plus overhead.[10] In fact, defendants consistently made a profit on their successfully bid state highway and turnpike projects. Nevertheless, the district court denied Johnson's motion for a directed verdict on the issue and chose not to instruct the jury on the legal test for predatory pricing.[11] Instead, the trial court "felt it was appropriate to let the jury decide where that line was to be drawn." We conclude from all the evidence, however, that the trial court erred by failing to grant a directed verdict in favor of defendants on the issue of predatory pricing.
 
 
 18
 While we recognize the basis for Judge Wilhoit's concern as to predatory pricing, we are unpersuaded by his argument. If a producer has achieved greater efficiency due to his economies of scale, it would be contrary to the purposes of the Antitrust laws to require that he price his product at a level higher than what he requires to make a profit. Johnson continually made profits on its ventures. This is not a case where the defendant failed to account for his long term overhead costs in making his bids. The bids were above the total average costs. To require that Johnson's bids be above competitors' costs would deprive Johnson (and others similarly situated) of reward from greater efficiency. This would serve only to stifle the incentive to compete.[12] Such cannot be the aim of the Antitrust laws of this country. See, MCI Communications Corp. v. AT&T Co., 708 F.2d 1081 (7th Cir.1983); Hanson v. Shell Oil Co., 541 F.2d 1352 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977).
 
 
 19
 At the time of the trial below, this Circuit had not definitely declared a standard for evaluating claims of predatory pricing. Subsequently, however, a cost-based standard was adopted in D.E. Rogers Associates, Inc. v. Gardner-Denver Co., 718 F.2d 1431 (6th Cir.1983), this court selected the Ninth Circuit's modification of the "Areeda/Turner" rule. See Areeda & Turner, Predatory Pricing & Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975) (Pricing below marginal or average variable cost presumed predatory while pricing above marginal or average cost conclusively presumed legal). The Ninth Circuit standard was set forth in William Inglis v. ITT Continental Baking Co., 668 F.2d 1014 (9th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982):
 
 
 20
 [W]e hold that to establish predatory pricing a plaintiff must prove that the anticipated benefits of defendant's price depended on its tendency to discipline or eliminate competition and thereby enhance the firm's long term ability to reap the benefits of monopoly power. If the defendant's prices were below average total cost but above average variable cost, the plaintiff bears the burden of showing defendant's pricing was predatory. If, however, the plaintiff proves that the defendant's prices were below average variable cost, the plaintiff has established a prima facie case of predatory pricing and the burden shifts to the defendant to prove that the prices were justified without regard to any anticipated destructive effect they might have on competitors.
 
 
 21
 Id. at 1035-36. Although this Circuit has adopted the above standard, we reject the Ninth Circuit's recent extension of that standard in Transamerica Computer Co. v. I.B.M. Corp., 698 F.2d 1377 (9th Cir.1983) (pricing above average total costs may be deemed predatory upon clear and convincing proof of predatory intent).
 
 
 22
 Langenderfer's theory at trial (and in this appeal) was that defendants intentionally and consistently bid below the cost level of smaller competitors. Allegedly, Johnson could have submitted higher bids and still won the paving contracts, but it "left money on the table" in order to make it impossible for other firms to compete. Although Johnson never bid below its own cost, it supposedly engaged in a pattern of predation by forcing competitors to choose between foregoing sales or operating at a loss. No doubt this was an unpleasant choice for smaller firms such as Langenderfer, but Johnson cannot be found to have committed predatory pricing simply because it was more cost efficient than its competitors and could afford to submit a lower bid on the jobs in question. "It is the very nature of competition that the vigorous, efficient firm will drive out less efficient firms. This is not proscribed by the antitrust laws." Janich Brothers, Inc. v. American Distilling Co., 570 F.2d 848, 855 (9th Cir.1977), cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978).
 
 
 23
 Langenderfer's argument is premised on the false belief that predatory pricing may be found solely on the basis of the seller's intent. We agree that motive or intent is the distinguishing characteristic of predatory pricing, as this Circuit stated in Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818 (6th Cir.1982):
 
 
 24
 Predatory pricing differs from healthy competitive pricing in its motive: "a predator by his pricing practices seeks 'to impose losses on other firms not garner gains for itself.' " Malcolm v. Marathon Oil Co., 642 F.2d 845, 853-54 (5th Cir.), cert. denied, 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981) (footnote omitted).
 
 
 25
 691 F.2d at 823. Any definition of predatory pricing, however, must also accommodate the economic policies of the antitrust laws to promote efficiency, encourage vigorous competition and maximize consumer welfare.
 
 
 26
 The rule advocated by Langenderfer would work contrary to these goals by forcing a larger, more efficient firm to maintain artificially high prices to the detriment of the public. In MCI Communications Corp. v. AT&T Co., 708 F.2d 1081 (7th Cir.1983), the court thoroughly reviewed the multiple evils that such a rule would occasion:
 
 
 27
 MCI nonetheless argues in its cross-appeal that the district court erred in requiring it to prove that AT & T priced its Hi-Lo service below any measure of cost. MCI contends that if AT & T knowingly sacrificed revenue (i.e., failed to maximize its profits) with the intent to injure competition, this court should hold that behavior to constitute unlawful predatory pricing. In support of this "profit maximization" theory, MCI cites a trio of cases. Hanson v. Shell Oil Co., 541 F.2d 1352, 1358 n. 5 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977); International Air Industries, Inc. v. American Excelsior Co., 517 F.2d 714, 724 (5th Cir.1975), cert. denied, 424 U.S. 943, 96 S.Ct. 1411, 47 L.Ed.2d 349 (1976); ILC Peripherals Leasing Corp. v. IBM Corp., 458 F.Supp. 423, 432 (N.D.Cal.1978), aff'd. per curiam sub nom. Memorex Corp. v. IBM Corp., 636 F.2d 1188 (9th Cir.1980), cert. denied, 452 U.S. 972, 101 S.Ct. 3126, 69 L.Ed.2d 983 (1981).
 
 
 28
 Each of these cases contains language to the effect that a price may be predatory if it is below the short-run profit-maximizing price and barriers to new entry are great. Assuming, arguendo, that these statements are more than mere dicta, we must reject such a "profit maximization" theory as incompatible with the basic principles of antitrust. The ultimate danger of monopoly power is that prices will be too high, not too low. A rule of predation based on the failure to maximize profits would rob consumers of the benefits of any price reductions by dominant firms facing new competition. Such a rule would tend to freeze the prices of dominant firms at their monopoly levels and would prevent many pro-competitive price cuts beneficial to consumers and other purchasers. In addition a "profit maximization" rule would require extensive knowledge of demand characteristics--thus adding to its complexity and uncertainty. Another, and related, effect of adopting the "profit maximization" theory advocated by MCI would be to thrust the courts into the unseemly role of monitoring industrial prices to detect, on a long term basis, an elusive absence of "profit maximization." Such supervision is incompatible with the functioning of private markets. It is in the interest of competition to permit dominant firms to engage in vigorous competition, including price competition. See Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263, 273 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). We therefore reject MCI's "profit maximization" theory and reaffirm this Circuit's holding that liability for predatory pricing must be based upon proof of pricing below cost. Chillicothe Sand & Gravel Co. v. Martin Marietta Corp., 615 F.2d 427 (7th Cir.1980).
 
 
 29
 Id. at 1114 (footnote omitted). As more succinctly stated in Hanson v. Shell Oil Co., 541 F.2d 1352 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977):
 
 
 30
 The antitrust laws were not intended, and may not be used, to require businesses to price their products at unreasonably high prices (which penalize the consumer) so that less efficient competitors can stay in business. The Sherman Act is not a subsidy for inefficiency.
 
 
 31
 Id. at 1358-59. We agree with this rationale expressed in the MCI and Hanson cases.
 
 
 32
 Johnson attained economies of scale which enabled it to operate at a much lower cost per paving project than its competitors. On the basis of the record presented, we can express no opinion about whether this position of strength may have resulted from some other types of prohibited anticompetitive acts. We hold only that, as a matter of law, Sherman Act liability cannot be premised on alleged predatory pricing without some evidence that a defendant has charged prices below its total cost for the product sold. Since Langenderfer premised its allegation of anticompetitive conduct almost entirely on the claim of predatory pricing and since the jury was not required to return special interrogatories, we cannot discern whether the jury verdict was based on the legally insufficient proof of predatory pricing or on the other allegations of anticompetitive acts. Consequently, we must vacate the judgment below and remand for new trial.
 
 ACQUISITIONS
 
 33
 Johnson raises two arguments against assessment of liability for violations of Section 7 of the Clayton Act. First, defendants note that six of the acquired companies[13] rarely, if ever, competed with Langenderfer before they were acquired by Johnson. Consequently, they claim the acquisitions had no "anticompetitive effect" on Langenderfer as required under Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977). We find the argument unpersuasive because appellant mistakenly focuses on past competition between Langenderfer and the acquired companies, and because appellant has misinterpreted the holding in Brunswick.
 
 
 34
 The plaintiff in Brunswick sought to recover profits it claimed it would have reaped if Brunswick had not acquired and revitalized several failing bowling alleys that competed with plaintiff. Since the antitrust laws were never intended to provide redress for injury caused by increased competition, the court rejected plaintiff's theory.
 
 
 35
 Plaintiffs must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which made defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.
 
 
 36
 Id. at 489, 97 S.Ct. at 697. Brunswick does not require proof that the acquisitions had an "anticompetitive effect" on Langenderfer. Instead, Brunswick requires that Langenderfer's injury result either from a lessening of competition due to the acquisitions or from "anticompetitive acts made possible" by the acquisitions. One of Langenderfer's theories at trial was that the acquisitions eliminated the competitive pressures of the acquired companies and enabled defendants to engage in other monopolistic acts such as monopolistic pricing, profit squeezing, and predatory bidding. If true, this alone satisfies the requirement of Brunswick. Absent other error regarding the Clayton Act cause of action, the issue of whether Langenderfer's injuries resulted from "anticompetitive acts made possible" by the acquisitions was properly a jury question.
 
 
 37
 Johnson next argues that none of the acquisitions met the jurisdictional requirement of Section 7 of the Clayton Act. At the time of trial the statute was limited to corporate acquisitions where both the acquiring and the acquired companies engaged in interstate commerce.[14] The district court granted Langenderfer's motion for a directed verdict as to Clayton Act jurisdiction because the companies all performed work on interstate highways. The court clearly erred.
 
 
 38
 In United States v. American Building Maintenance Industries, 422 U.S. 271, 95 S.Ct. 2150, 45 L.Ed.2d 177 (1975), the Supreme Court held that the Clayton Act, unlike the Sherman Act, does not reach companies engaged in purely intrastate activities even though there may be a substantial effect on interstate commerce. Langenderfer relies on Fort Lauderdale v. East Coast Asphalt Corp., 329 F.2d 871, 872 (5th Cir.), cert. denied, 379 U.S. 900, 85 S.Ct. 187, 13 L.Ed.2d 175 (1964), for the rule that "contractors engaged in the construction of interstate highways and other facilities of interstate commerce are engaged 'in commerce.' " That "rule" is no longer valid, however, in light of Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). In Copp Paving, the Court reviewed the uniquely localized nature of asphalt hot-mix markets and held that intrastate sales of asphalt for use on interstate highways was not alone sufficient to establish jurisdiction under the Clayton Act.
 
 
 39
 With the exception of Union Quarries Co., there is no evidence in the record that any of the acquired companies were directly engaged in interstate commerce. Langenderfer apparently chose to rely solely on the interstate highway nexus, as did the district court. As noted above, this was clear error under American Building Maintenance and Copp Paving. Based on the evidence presented at trial, the district court erred by granting a directed verdict in favor of Langenderfer, and by denying a directed verdict for Johnson Companies on the Clayton Act cause of action as to all of the acquisitions except Union Quarries Co.
 
 
 40
 Because of errors on the issues of Clayton Act jurisdiction and predatory pricing we conclude that we must vacate the judgment below. Consequently, we find it unnecessary to address appellants' arguments regarding the scope of damages allowed, and we express no opinion about the possible merits of those arguments.
 
 DIVESTITURE
 
 41
 On cross appeal Langenderfer contends the trial court erred by refusing to order divestiture of Union Quarries, Tri-State Sand & Gravel, two of Johnson's six quarries, and four of Johnson's twelve hot-mix plants. The district court held that the drastic remedy of divestiture was not necessary to restore competition. The court also doubted its authority to grant divestiture in favor of a private plaintiff under Section 16 of the Clayton Act.
 
 
 42
 Langenderfer correctly observes that Section 16 injunctive relief has three primary purposes: "(1) putting an end to illegal conduct, (2) depriving violators of the benefits of their illegal conduct, and (3) restoring competition in the marketplace." In re Multidistrict Vehicle Air Pollution, 538 F.2d 231, 234 (9th Cir.1976) (citing Schine Chain Theatres, Inc. v. United States, 334 U.S. 110, 128-29, 68 S.Ct. 947, 957-58, 92 L.Ed. 1245 (1948)). We cannot, however, agree with Langenderfer's claim that the trial court's injunction against future acquisitions and anticompetitive acts only furthers the first of these purposes. Assuming culpability on the part of Johnson Companies, we believe the district court's injunction not only would deprive them of the primary benefits of their past conduct--continued growth through acquisitions and guaranteed market dominance for the future--but also would serve to bring about a greater degree of competition by eliminating the barriers allegedly erected. In any event, the fact that the remedy fashioned by the district court may have served certain purposes to a lesser extent than others provides no ground for assignment of error.
 
 
 43
 The more fundamental flaw in Langenderfer's argument is the proposition that divestiture is an available remedy in a suit instituted by a private plaintiff. Although several district courts have suggested that the remedy should be available, no court of appeals has so held. We find compelling the Ninth Circuit's decision, based on the legislative history of Section 16, that the statute does not create a private divestiture remedy. I.T. & T. Corp. v. G.T.E. Corp., 518 F.2d 913, 920-24 (9th Cir.1975). See also, Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 692-94 (9th Cir.1976); Continental Securities Co. v. Michigan Central Ry. Co., 16 F.2d 378, 379-80 (6th Cir.1926).
 
 PERMISSIVE INTERVENTION
 
 44
 MacRitchie Materials Co., a quarry operator and sister company of Langenderfer, filed a post-trial motion for permissive intervention in the injunctive relief hearings pursuant to Fed.R.Civ.P. 24(b). MacRitchie argued that it had an interest in the injunction proceedings because its own business interests were affected by Johnson's monopolistic practices. The district court found that MacRitchie's claims did not present sufficiently common questions of law and fact as had been addressed during trial and, accordingly, denied the motion. Claiming error, MacRitchie has cross-appealed the trial court ruling.
 
 
 45
 "[T]he denial of permissive intervention should be reversed only for clear abuse of discretion." FMC Corp. v. Keizer Equipment Co., 433 F.2d 654, 656 (6th Cir.1970); Brewer v. Republic Steel Corp., 513 F.2d 1222 (6th Cir.1975). We find no abuse of discretion in this case. The trial below focused on the impact of Johnson's practices on a particular competitor in the asphalt paving market. MacRitchie, a different competitor in a different product market, cannot now complain about the denial of a post-trial motion filed four years after commencement of this action.
 
 
 46
 For the reasons set forth above, the judgment of the district court is VACATED and this case is REMANDED for retrial.
 
 
 47
 WILHOIT, District Judge, dissenting.
 
 
 48
 I respectfully dissent from the Court's view that as a matter of law, Sherman Act liability on the basis of predatory pricing cannot be proven without some evidence that a defendant has charged prices below its average total cost. This circuit has previously taken the view that evidence of intent to predatorily price can be proven either by direct evidence (subjective proof) or by indirect evidence, through analysis, of whether a defendant was pricing above or below average variable cost (objective proof). The latter analysis provides a surrogate measurement for marginal cost at output levels at or near a firm's optimal level of production. See D.E. Rogers Associates, Inc. v. Gardner-Denver Co., 718 F.2d 1431 (6th Cir.1983); Richter Concrete Corp. v. Hilltop Concrete Corp., 691 F.2d 818 (6th Cir.1982); Borden, Inc. v. Federal Trade Commission, 674 F.2d 498 (6th Cir.1982).[1]
 
 
 49
 The Court takes a different approach today. It says, in effect, that irrespective of any direct evidence of intent to predatorily price, if a defendant can prove objectively that his prices were above his average total costs, his conduct is per se legal. This gives me pause. What the Court seems to do is to create a "free zone" in which monopolists can exploit their power without fear of Sherman Act scrutiny or sanctions. Transamerica Computer Co. v. IBM Corp., 698 F.2d 1377, 1387 (9th Cir.1983).
 
 
 50
 The fact is that the question of proving average variable and fixed costs can be most difficult. Indeed, another panel of this court recently confronted a perfect example of just how hard it is to allocate "costs" in antitrust cases. See D.E. Rogers, 718 F.2d at 1435. In that case there was a great deal of argument as to what should be included in the average cost figures. Due to the inherent uncertainty and imprecision in determining "cost," I am persuaded by the view expressed by the Ninth Circuit Court of Appeals in that it is simply unwise to create a per se legal zone of predatory pricing irrespective of other conduct and circumstances. See Transamerica, 698 F.2d at 1387. To do so simply encourages litigants to skewer their accounting data to be above or below average total cost.
 
 
 51
 Beyond these practical problems of proof, the record in this case convinces me that Johnson was found to be guilty of monopolistic practices, including predatory pricing. The evidence is clear that Johnson specifically intended to drive Langenderfer out of business. Moreover, Johnson's rapid and numerous vertical as well as horizontal acquisitions documents well that it had the power to carry out this intent.
 
 
 52
 The alleged predatory pricing in this case was nothing more than a manifestation of Johnson's monopoly power. The majority readily admits that Johnson had "attained economies of scale which enabled it to operate at a much lower cost per paving project than its competitors." Ante at 1058. It is clear, therefore, that Johnson possessed substantial market power over its competitors, market power which when coupled with the evidence of Johnson's increasing market share (from 46.9% to 75.8%) indicates it undoubtedly possessed monopoly power.
 
 
 53
 Because Johnson possessed monopoly power, the only other issue for purposes of determining Sec. 2 Sherman Act liability is whether Johnson acquired or maintained that power willfully and intentionally as opposed to mere growth due to a superior product or business acumen. See United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966). In this case, I believe that Johnson willfully and intentionally used its inordinate market power to acquire and maintain a monopoly. Direct evidence of its intent substantiates this. But more importantly, Johnson's conduct establishes it in my mind beyond all doubt.
 
 
 54
 In an industry such as involved here, entrance barriers are unusually high. Start-up costs are enormous. Moreover, Johnson raised these entrance barriers even higher by its many vertical acquisitions. Competitors and potential competitors were discouraged from competing with Johnson because they had to get their supplies from Johnson.
 
 
 55
 In addition, because of Johnson's ability to operate at lower costs, a perfect climate existed for Johnson to predate. Johnson was able to bid paving contracts at price levels above its average total costs but low enough to drive competitors out of the market and discourage potential competitors from entering. This practice has sometimes been called "limit pricing" and the fear that a monopolist might undertake it was what probably inspired the Ninth Circuit in Transamerica.[2]
 
 
 56
 The majority lays aside the many circumstances raised in this case and focuses instead on the pristine economic view that pricing at or above average total cost is what competition is supposed to effect.
 
 
 57
 Unfortunately, the real world is not as it is always assumed in economics. If predatory pricing were the only allegation made in this case and there were no other evidences of monopoly power or monopolistic conduct and intent, I would agree with the majority. Predatory pricing cannot and should not be a competitor's complaint absent an abundance of evidence suggesting the alleged predator not only has the intent to predate, but also the ready ability, as in this case, to carry predation out. Cf. Transamerica, 698 F.2d at 1388.[3]
 
 
 58
 Nonetheless, as pointed out, I am firmly convinced by the record at hand that Johnson possessed monopoly power and that it used predatory pricing in the form of "limit pricing," among other things such as restrictive contracts and acquisitions, to maintain that monopoly power.
 
 
 59
 For instance, the majority opinion seems to dismiss the testimony of Howard Shank, Johnson's Vice-President, as mattering little. See ante at 1055 n. 10. The Court's view of Shank's testimony might be correct in other circumstances but on the facts of this case, it overlooks the extent of Johnson's vertical integration. The Court states that "[i]t matters little that Johnson might have employed a below-cost figure for gravel or any other item so long as the final bid exceeded the company's total projected costs." Id. (emphasis in original).
 
 
 60
 This overlooks the fact that Johnson was probably the only supplier of gravel in the relevant region. It supplied both its own needs and that of its competitors. Johnson could, therefore, raise the price of gravel to its competitors and thereby subsidize sales of gravel to itself. These below-cost line items may very well be a significant indicator of how Johnson was able to keep its "average total cost" figures so low. Having convinced the court that its "costs" were low, indeed lower than its final bid, Johnson has all but successfully defended this action for under the rule announced today, skillful juggling of cost figures has put appellant in the per se legal zone, i.e., pricing above average total costs.
 
 
 61
 I, therefore, respectfully dissent from the majority's view. I think Johnson possessed monopoly power and intended, as evidenced by its conduct, to maintain that power in contravention of Section 2 of the Sherman Act. I would therefore affirm the district court and remand this case only with respect to the question of remedy.
 
 
 
 *
 Honorable Henry R. Wilhoit, Jr., U.S. District Court for the Eastern District of Kentucky, sitting by designation
 
 
 [1]
 "Hot-mix" is also known as asphaltic concrete. It is manufactured by combining liquid petroleum with a mixture of sand and crushed limestone at high temperatures
 
 
 [2]
 State law requires competitive bidding. Ohio Rev.Code Chapters 5525 and 5537. State agencies determine where and whether a project will take place and reserve the right to reject any and all bids
 
 
 [3]
 The volume of available highway work is directly dependent on the amount of funds allocated to the state highway program. Substantial completion of the interstate highway system in the late 1960's resulted in a significant decrease in funds allocated for new highway construction in Ohio during the 1970's. The highway program in northwestern Ohio during the 1970's was primarily limited to maintaining and upgrading the existing roadways
 
 
 [4]
 The practical service area of a hot-mix plant is limited to a 25-30 mile radius due to hauling costs and the need to deliver the product at specified temperatures. The plants are typically located at or near quarries because of the high cost of hauling stone
 
 
 [5]
 MacRitchie Materials, Inc. is the sister company that unsuccessfully sought to intervene following the trial below
 
 
 [6]
 Defendants' annual shares of the relevant ODOT and OTC projects were as follows: 1972--65.3%; 1973--57.6%; 1974--82.5%; 1975--53.2%; 1976--62.6%; 1977--70.4%; 1978--51.3%
 
 
 [7]
 To establish monopolization of the ODOT-OTC asphalt paving market, Langenderfer had to prove that Johnson unfairly attained or maintained monopoly power. United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966). Monopoly power is "the power to control prices or exclude competition." Id. at 571, 86 S.Ct. at 1704
 
 
 [8]
 To establish that Johnson attempted to monopolize the ODOT-OTC asphalt paving market, Langenderfer had to prove that appellant "engaged in anticompetitive conduct with the specific intent to monopolize and that the attempt had a dangerous probability of success." Richter Concrete Corp. v. Hilltop Corp., 691 F.2d 818, 823 (6th Cir.1982), (quoting United States v. Dairymen, Inc., 660 F.2d 192, 194 (6th Cir.1981))
 
 
 [9]
 Support for the allegations of other types of anticompetitive conduct was meager at best. Although injunctive relief was granted against a broad array of wrongful acts, the trial court made the following observation about Langenderfer's proof:
 Plaintiffs request injunctions against certain anticompetitive practices of the defendants which were not specifically proven by evidence at trial. For example, plaintiffs seek prohibitions against the defendants' alleged practices of charging discriminatory stone prices, refusing to sell stone or sand to plaintiffs, and tying sales of asphaltic concrete to purchases of stone and sand. (emphasis added)
 
 
 [10]
 Langenderfer attempts to rely on the testimony of Howard Shank who was Johnson's Vice President and chief bidding estimator. Shank testified that in preparing bids, he often programmed specific items below cost. The relevant product in this case, however, was the total package of asphalt paving materials and services, not specific line items in a contract bid. It matters little that Johnson might have employed a below-cost figure for gravel or any other item so long as the final bid exceeded the company's total projected costs
 
 
 [11]
 Even if the evidence had been sufficient to avoid a directed verdict, the trial court's failure to instruct the jury on the legal standard for predatory pricing was erroneous. "The choice of a cost-based standard for evaluating claims of predatory pricing is a question of law to be decided by the trial judge." M.C.I. Communications Corp. v. A.T. & T. Co., 708 F.2d 1081, 1111 (7th Cir.1983)
 
 
 [12]
 Further support for this decision may be drawn from Judge Kennedy's dissent in Borden, Inc. v. F.T.C., 674 F.2d 498, 519 (6th Cir.1982). While that case dealt with the manipulation of a price premium for a heavily advertised product, not below cost pricing, it was noted by that Judge that "business acumen includes shrewdness in profitable price competition, which is pricing above average variable cost; the Sherman Act does not distinguish competition on the basis of price and performance." Id., citing California Computer Products v. International Business Machines Corp., 613 F.2d 727, 742-43 (9th Cir.1979). See also Areeda & Turner, "Predatory Pricing and Related Practices under Section 2 of the Sherman Act," 88 Harv.L.Rev. 697 (1975). Professor (now Judge) Posner would also agree that there is no violation where a monopolist sells above average total cost, as in the instant case. R. Posner, Antitrust Law: An Economic Perspective, 188 (1976), cited in Borden, Inc. v. F.T.C., 674 F.2d at 519 n. 3. (Kennedy, dissenting)
 
 
 [13]
 C.P. Calaway, Inc., Price Construction Co., Ohio Engineering, Fred R. Creager & Sons, Northwest Materials, Inc. and Union Quarries Company
 
 
 [14]
 The statute was amended in 1980 to expand jurisdiction to acquisitions in which both the acquiring and the acquired companies are "engaged in commerce or in any activity affecting commerce." Pub.L. No. 96-349, Sec. 6(a), 94 Stat. 1157. Section 6(b) of Pub.L. No. 96-349 limited application of the amendment to acquisitions made after September 12, 1980
 
 
 [1]
 As the Court notes in its opinion, this Circuit has recently adopted the Ninth Circuit's modified "Areeda/Turner" rule. See ante at 1056. Areeda and Turner first propounded a most influential discussion of how a determination of average variable costs can fairly approximate marginal cost at output levels at or near a firm's optimal level of output. That level, of course, is where a firm is producing at its minimum average costs. Areeda & Turner, Predatory Pricing & Related Practices Under Section 2 of the Sherman Act, 88 Harv.L.Rev. 697 (1975)
 D.E. Rogers, 718 F.2d 1431, the case in which this circuit adopted the modified "Areeda/Turner" rule, makes no mention of what the rule should be in situations where, as here, the defendant was pricing at a level above average total cost. Areeda and Turner would presume such to be legal. The majority today agrees. I do not, however, because I believe evidence of intent in circumstances such as presented in this case should play a substantial role in determining whether predatory pricing has occurred.
 
 
 [2]
 In Transamerica, 698 F.2d at 1387, the Ninth Circuit discusses how, in an industry where a substantial initial investment is required, a monopolist could predate with a pricing strategy that is above average total cost but below the profit maximizing price of competitors or potential competitors. This strategy is labeled "limit pricing", and appears to be the type of strategy employed by Johnson here
 
 
 [3]
 The Transamerica case's so-called "extension," see ante at 1056, of William Inglis & Sons Baking Co. v. ITT Continental Baking Co., 668 F.2d 1014 (9th Cir.1981), cert. denied, --- U.S. ----, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982), which the majority today refuses to follow, is the natural outgrowth of the Inglis case. The Ninth Circuit has consistently indicated, even prior to Inglis, that given the right set of facts concerning a defendant's motive and conduct, it might very well hold a limit pricing strategy impermissible. See California Computer Product, Inc. v. IBM Corp., 613 F.2d 727, 743 (9th Cir.1979); Hanson v. Shell Oil Co., 541 F.2d 1352, 1358 n. 5 (9th Cir.1976), cert. denied, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 792 (1977)
 The Transamerica case takes the Inglis rule the next logical step and adopts a reasonable view of how to treat an alleged predator's prices that are above its average total cost. It allocates a heavy burden upon the plaintiff to prove by clear and convincing evidence, that the defendant was predatorily pricing. Transamerica, 698 F.2d at 1388. At the same time, however, it does not allow a monopolist, such as Johnson in this case, to escape liability on the basis of predatory pricing merely because it did not price below its average total cost.
 The D.E. Rogers, 718 F.2d at 1436, case in this circuit likewise suggests that the Sixth Circuit would not permit a limit pricing scheme at or above average total cost upon a strong showing of motive and/or other monopolistic conduct. While D.E. Rogers does not directly present the issue decided today, it does indicate just as Transamerica's predecessors that "direct evidence bearing on the issue of [a defendant's] motive" is an important consideration. Id. at 1437. Indeed, only because of the absence of, or ambiguous nature of, such direct evidence was a cost-based analysis even resorted to in that case. See id. at 1435.